David Allen **PARR**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 16319.

United States Court of Appeals Ninth Circuit.

Oct. 29, 1959.

5. See also, United States v. Debrow, 1953 346 U.S. 374, 376, 74 S.Ct. 113, 98 L.Ed. 92; Roberson v. United States, 5 Cir., 1956, 237 F.2d 536, 537.

J. B. Tietz, Los Angeles, Cal., for appellant.

Lynn J. Gillard, U. S. Atty., Donald B. Constine, John Kaplan, Asst. U. S. Attys., San Francisco, Cal., for appellee.

Before CHAMBERS, POPE and HAMLIN, Circuit Judges.

POPE, Circuit Judge.

Appellant, who was a registrant subject to the provisions of the Universal Military Training & Service Act, 50 U.S. C.A.Appendix, 462(a) was indicted and

convicted for violation of that act in that he knowingly refused to submit himself to induction in the armed forces. The record shows that appellant registered with the Selective Service on May 7, 1951; he was then 18 years of age. He filed the classification questionnaire called for by the regulations on November 13, 1951, claiming to be a minister of religion regularly serving with the Jehovah's Witnesses sect; he also stated that he was conscientiously opposed to participation in war in any form.

Parr was first classified IV-D (minister) by the local board. Later the board received information from the appellant which caused it to procure a further questionnaire from him and this was received on March 29, 1954. The information there given suggested some doubt as to a continuing ministerial status and the board then sent him its Form 150 which was specially prepared for answers by conscientious objectors. After the completed Form 150 had been received the board reviewed his file and classified him in Class 1-A, (available for full military service). He took an appeal to the appropriate appeal board which referred his file to the Department of Justice for the usual inquiry and hearing by a hearing officer.

On January 15, 1957, the Department of Justice transmitted to the appeal board a lengthy letter summarizing information obtained from the Selective Service file and from a résumé of the reports presented to the hearing officer by investigating officers and others. The letter of the Department concluded that the appellant was not sincere in his conscientious objection to participation in combatant and non-combatant military training and service and recommended that the appeal be not sustained. The board proceeded to reject the appeal and continued him in Class 1-A.

It was stipulated and conceded that although appellant was ordered to report for induction he refused to do so. The appeal from his conviction is based upon the contention that there was no basis in fact for classifying him in Class 1-A;

and that the denial of his classification as conscientious objector was arbitrary, capricious and without basis in fact.

When appellant was first given the ministerial classification he was in attendance at what was known as the "Bethel Family and Headquarters Staff" of the Watchtower Bible & Tract Society at Brooklyn, New York, where he appears to have been engaged in ministerial activities and as a student of the ministry. Later he ceased his activities there and engaged in primarily secular employment at Sacramento, California, and elsewhere. This is what led the board to seek answers to its further questionnaire. At any rate, there is no contention, and there could not be, that the appellant was entitled to any ministerial classification. The primary question concerns his claim of a conscientious objector's exemption.

The test which the court below was required to apply in passing upon the validity of the appellant's classification is that set forth in Witmer v. United States, 348 U.S. 375, 381–382, 75 S.Ct. 392, 396, 99 L.Ed. 428, as follows: "Here the registrant cannot make out a prima facie case from objective facts alone, because the ultimate question in conscientious objector cases is the sincerity of the registrant in objecting, on religious grounds, to participation in war in any form. In these cases, objective facts are relevant only insofar as they help in determining the sincerity of the registrant in his claimed belief, purely a subjective question. In conscientious objector cases, therefore, any fact which casts doubt on the veracity of the registrant is relevant. It is 'affirmative evidence * * * that a registrant has not painted a complete or accurate picture * *.' * * * If, as here, the issue is the registrant's sincerity and good faith belief, then there must be some inference of insincerity or bad faith."

The Witmer case furnishes a useful suggestion as to how we should consider this record for the purpose of ascertaining the validity of the appellant's claim

that his classification lacked basis in fact. In that case the Court approached the task before it as follows: "Since Witmer stated his beliefs with apparent sincerity, and since we find no indication anywhere in the record that his demeanor appeared shifty or evasive or that his appearance was one of unreliability, we must examine the objective facts before the Appeal Board to see whether they cast doubt on the sincerity of his claim."

The appellant also stated his beliefs with apparent sincerity. He disclosed in his Form 150 that he was a member of the Watchtower Bible and Tract Society; that in association with that organization he began to study the Bible with his parents and other Jehovah's Witnesses in 1939; he attached quotations from numerous passages in the Bible from which he said he drew the conclusion that he could not, consistent with his religious beliefs, participate in war or in military activities in any form.

There is no indication anywhere in the record that appellant's demeanor appeared shifty or evasive or that his appearance was one of unreliability. The Selective Service record shows that he never appeared in person either before the local board or before the appeal board; hence it cannot be said that the judgment of the Selective Service officials was based upon his appearance or demeanor. While he did appear before the Department of Justice hearing officer, yet neither the letter of the Department of Justice nor the résumé of the inquiry about him by officers of the Department contained any reference to or suggestion of an appearance of unreliability. We therefore conclude, as this court did in Ashauer v. United States, 9 Cir., 217 F.2d 788, 791, and in Pitts v. United States, 217 F.2d 590, 592, that a denial of a conscientious objector classification finds no basis whatever in any conclusion founded upon the appellant's demeanor or appearance.

This brings us to the question of whether the objective facts appearing in the record and which were before the appeal board tend to cast doubt on the sincerity of the appellant's claim. The letter which the Department of Justice furnished to the appeal board and the résumé of the Department's inquiry about him which is referred to therein, allude to substantially all of the record which is relevant here. In general these disclose that the registrant's parents and brothers had been members of the Jehovah's Witnesses for many years; he was brought up and baptized in that faith; he had an eighth grade education; his teachers recalled that in school he refused to salute the flag, an attitude common with members of that sect. The Department of Justice officers are shown by the résumé of their inquiry to have made a thorough investigation of registrant's past life and background. All persons interviewed recalled that appellant was an active member of Jehovah's Witnesses and that his parents were extremely strong members of the faith. This information came from former school teachers, former employers, neighbors, associates, and religious officers in Jehovah's Witnesses organizations. Without exception every one interviewed by these officers, as reflected in the résumé, testified to the appellant's good character, reputation, and sincerity in his religious beliefs. He participated in Jehovah's Witnesses study activities and his father did also. The family were regular attendants at meetings of the sect and the appellant repeatedly expressed his objections on religious grounds to participation in war.

It appears from the résumé that the officers had interviewed an official of the Watchtower Bible and Tract Society at Brooklyn, New York. This person advised that he had supervised the appellant's activities in that place from April 12, 1951 to September 21, 1953; that he had no derogatory information concerning the appellant's character; and that "although he was a good factory member he had failed to meet the requirements of a Bethel member"; that while the registrant possessed the necessary faculties which would enable him to become a minister, he was immature in spiritual

knowledge and did not apply himself to the Bible study and failed to perform his ministerial work; that he considered the registrant as being "spiritually sick and a' playboy." "He pointed out that on many occasions he had verbally strongly reprimanded the registrant with the hope that the registrant would correct himself. He further stated that registrant failed to right himself and that under his direct orders, the registrant was requested to leave the staff of the Bethel family of Brooklyn. He stated the registrant withdrew from the Bethel Home approximately two weeks prior to the date that his training was to have been completed. He also pointed out that since the registrant had failed to devote the necessary amount of time in his ministerial work, he was removed from the Pioneer list and to date, his name has not been reentered on that same list. He explained that he has not received any information regarding the registrant since he left the Bethel family, and advised that despite his shortcomings in his ministerial work, he personally believed the registrant to be sincere in his claim of being a conscientious objector."

Since the Department's adverse recommendation to the appeal board is in large part based upon the report just quoted, it requires some comment. It should be noted that Mr. Larson, the official who made the statement, (apparently the superintendent of a ministerial school), concluded by stating his personal belief that appellant was sincere in his claim of being a conscientious objector. It is also noteworthy that on September 12, 1953, just 11 days before the appellant left the Bethel institution, and when his departure was known to Larson, the latter made and signed a written statement praising the work of the appellant in the printing shop and concluding: "Our organization found Mr. Parr to be very capable and always reliable. In all of his dealings with our Society he was fully honest and trustworthy. He had an excellent attendance record and was of high moral standing. In view of these qualifications, he has our highest recommendation."

Whoever interviewed Mr. Larson, as noted in the résumé, left his quoted words that he considered registrant "spiritually sick and a playboy" dangling in the air. His investigation was obviously inadequate without pursuing an inquiry as to what the superintendent of the religious institution meant by the word "playboy". To some "playboy" might mean one given to riotous living; but with a presumably devout Jehovah's Witness like Larson, who, as noted, gave testimonial to appellant's "high moral standing", the word "playboy" may well mean something different. We could hardly call such a person a sanctimonious bigot even if he thought one who attended a theatre, or smoked a cigarette, or played ball on Sunday, or even played ball instead of standing on the corner displaying the "Watchtower", was a "playboy" or "spiritually sick". Pharisaical criticism of even good persons has been a matter of historical record.[1] Without more knowledge than we, or the Department of Justice officer, can have as to Mr. Larson's standards for correct deportment, the quoted report from him is worthless for any bearing it may have upon appellant's sincerity in objecting to military service. All we know from this is that Mr. Larson did not consider appellant a suitable candidate for the ministry.

Another item which the Department of Justice called to the attention of the appeal board is based on a comparison between the handwritten answers given by the appellant in his questionnaire, on the one hand, and the typewritten additions appended to those documents, on the other. The Department's letter stated: "It will be noted that these answers which are apparently in the registrant's own handwriting show a level of education and learning far below that appear-

---

1. Mark 2:16: "And when the scribes and Pharisees saw him eat with publicans and sinners, they said unto his disciples, How is it that he eateth and drinketh with publicans and sinners."

ing in the typewritten additions to his SS Form 100 and 150. It would seem obvious that the registrant has had considerable help in completing his questionnaires. If so, this fact has not been indicated on those forms as required."

An examination of the portions of the questionnaire which were answered by the appellant in his own handwriting discloses that he lacked facility in printing or lettering. In those parts he undertook to print his answers. They are poorly aligned and not too neat, and there are a few mistakes in spelling. The word "physical" he printed "phsyical"; he spelled the word "Witness" with two "t's"; there appears the word "sincerley" and in the word "guidance" he substituted an "e" for the "a".[2]

Some of the typed addenda which the Department pointed to as containing few misspelled words were copies of texts from the Bible and may have been copied by the registrant. It may well be that mistakes in spelling are more readily made when a person is printing an answer than when he is writing it. The lack of neatness and irregularity in appellant's writing could well be accounted for by the fact that his physical examination showed that he is left-handed, has a stiff index finger on that hand, and has lost a portion of his index finger on the right hand. Before any fair conclusions can be drawn from the handwriting it would be important to know whether this was a left-handed man who was forcing himself to use his right hand in writing.

The comment of the Department evidently refers to a statement appearing at the foot of the signed questionnaire which recites: "If another person has assisted the registrant in completing this questionnaire, such person shall sign the following statement", then follows a statement as to why such person had assisted in the preparation of the questionnaire. This portion is not filled out or signed.

It seems to us that the Department's attempted emphasis upon this circumstance as showing a lack of sincerity is rather strained. There is no statement in the questionnaire that appellant did not have help. He was not asked to state whether he did or did not have assistance. The printed statement at the foot of the questionnaire is ambiguous. It speaks of "completing the questionnaire"; it says nothing about furnishing addenda to the questionnaire. A person in the position of this appellant might well think that since he filled out the questionnaire proper in its entirety this call for execution of a statement by another person was not relevant. Again, what if a registrant asks a friend to type for him statements to be appended to the questionnaire? Would this mere typing be regarded as "assistance" calling for a signature by the typist? Surely the questionnaire does not make that plain.

It is no doubt possible that registrant at times had the help of a typist. In the file are several letters to the local board telling them of changes of address. They are excellently typed, evidently by someone skilled in such work. If registrant had his addenda typed by some friend, who in typing, spelled correctly, what of it? He was not asked: Did someone do typing for you?

True, if there was any special reason why registrant should tell the board: "The foregoing was typed up for me by a friend," he could appropriately say so. When he replied to the Department's comment on disparity in level of education he said: "I assure all of the answers are my own thoughts in my own choice of words." Perhaps the statement would have been more complete and full if he

**2.** The Department notes what it calls a grammatical error. It quotes an answer as to his hours of work, as "They varies". This is not a precise representation of what the questionnaire shows. It shows that appellant wrote both "They" and "It" before "varies" and then scratched out the "It". Of course the result was ungrammatical, but the record does not negate the possibility that the alteration made was merely inadvertent or an oversight. It proves nothing as to his knowledge of grammar.

had said: "Although the typing was done by a friend, I assure all of the answers are my own thoughts in my own choice of words." Or, if the facts were otherwise if he added to the statement actually made, the words "and I did all my own typing." But there was no occasion for any such statements, as there was no inquiry on that point. If the appellant is a poor speller, if he had help from some one in typing the addenda which he attached to his questionnaire; if he read the instructions at the foot of the questionnaire calling for a signature by whoever helped him as not having reference to help in preparation of matters outside the questionnaire proper; if he simply forgot to have that signature procured, or to certify that he had some help, or if he refused to comply with that notice to obtain the signature of his helper, none of these things would have the slightest bearing on his honesty, sincerity or good faith as a conscientious objector.

■ Next, the Department of Justice undertook to make a further point as follows: "He declared 'I would not accept a classification of I-O because it would mean working for the Government. That would be similar to military service. My duty is to Jehovah first.'" If the Department was by this intending to advise the appeal board that appellant was not entitled to a conscientious objector classification because his objection to participation in war was only a facet of his real objection to all governmental authority, then the Department was giving advice as to a legal point which was specifically disapproved in Sicurella v. United States, 348 U.S. 385, 391, 75 S.Ct. 403, 99 L.Ed. 436. And such bad advice might well, in and of itself, tend to nullify the action of the appeal board for the reasons stated in the Sicurella case and in Shepherd v. United States, 9 Cir., 217 F.2d 942, 945 to 946; Id., 9 Cir., 220 F.2d 855. As stated by the Supreme Court: "If the requisite objection to participation in war exists, it makes no difference that a registrant also claims, on religious grounds, other exemptions which are not covered by the Act. Once he comes within § 6(j),

he does not forfeit his coverage because of his other beliefs which may extend beyond the exemptions covered by Congress." [75 S.Ct. 406.]

The Department's letter purported to find inconsistency between the registrant's statement of his original questionnaire that he was devoting his entire time and life to the ministry with evenings and weekends devoted to door to door preaching, and the statement of Larson that the registrant was spiritually sick and a playboy, and that he had reprimanded the registrant and requested him to leave the staff of the Bethel Family in Brooklyn. But the Department overlooked the most significant feature of these two statements, which is the difference in their dates.

The statement of the registrant that he was devoting his full time to religious work was made on November 10, 1951, shortly after he had begun his ministerial training at Bethel. The precise date when Mr. Larson made his "playboy" reference is not shown in the résumé but it was between February 23 and April 29, 1955. There is no inconsistency whatever here, for what the registrant was doing in 1951 and what he was doing in 1953, just before his dismissal from the seminary, are two completely different things. We find no merit whatever in this suggestion of the Department's letter.

■ It is plain that the author of the Department of Justice letter of advice to the appeal board based his conclusions solely upon what he found in the Selective Service record of the registrant. We are as able as he to examine and evaluate that record. We are frank to say that we find no merit in the contentions made by the Department. That leaves the case in this situation: the appeal board necessarily based its conclusions that it would deny the conscientious objector classification solely upon the selective service record and the letter of the Department of Justice with its accompanying résumé. Since in our view there is nothing in any of these documents or records which furnishes any basis in fact for the board's

denial of a conscientious objector status for the registrant, we hold that the judgment must be reversed.

The judgment is reversed with directions to dismiss the indictment.