UNITED STATES of America, Plaintiff-Appellee,

v.

Richard Secor CORLISS, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Fred August HEISE, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Walter HEROLD, Defendant-Appellant.

Nos. 151–153, Dockets 25706–25708.

United States Court of Appeals Second Circuit.

Argued Dec. 1, 1959.

Decided July 22, 1960.

810

Hayden C. Covington, Brooklyn, N. Y. (Herman Adlerstein, New York City, on the brief), for defendant-appellants.

Robert E. Scher, Asst. U. S. Atty., New York City (S. Hazard Gillespie, Jr., U. S. Atty., and George I. Gordon, Asst. U. S. Atty., New York City, on the brief), for plaintiff-appellee.

Before CLARK, WATERMAN and FRIENDLY, Circuit Judges.

FRIENDLY, Circuit Judge.

These are appeals from judgments of the District Court for the Southern District of New York convicting appellants, who claim to be conscientious objectors, of refusing to submit to induction into the armed forces of the United States, 50 U.S.C.A.Appendix § 462. Each appellant was sentenced for a year and a day. The facts are stated in Judge Murphy's reasoned opinion, 173 F.Supp. 677 (1959); we shall refer only to such as are required for disposition of the appeals.

All three cases followed the same general course—classification or reclassification of the registrant as I–A by the Local Board after personal appearance by the registrant; request for appeal; investigation by the Federal Bureau of Investigation; hearing before a hearing officer of the Department of Justice, with a résumé of the FBI report having pre-viously been furnished; adverse report by the hearing officer to the Department; adverse recommendation by the Department to the Appeal Board; I–A classification by the Appeal Board; refusal of the registrant to be inducted; indictment, trial to the judge, and conviction. A point common to all three appeals was an order of the District Court, Alexander Bicks, J., quashing subpoenas whereby appellants sought production of the investigative reports of the FBI. Since the issue whether persons in appellants' position were entitled to discovery of such reports was pending before the Supreme Court in Gonzales v. United States, 80 S.Ct. 1554, decided June 27, 1960, we deferred decision pending resolution of that issue there.[1] Appellants do not claim the résumés were inaccurate, and the Department's recommendations were based on materials in appellants' Selective Service files, the hearing before the hearing officer, and, in a minor degree, uncontroverted facts in the résumés. The cases thus fall within the rule of non-production of the FBI investigative reports laid down in Gonzales and not within the exception, there stated, of "circumstances in a particular case where fairness in the proceeding might require production."

The principal questions remaining, indeed the only ones in Corliss' and Heise's appeals, are whether there is any basis in fact to sustain the Appeal Board's denials of appellants' claims that "by reason of religious training and belief" they are "conscientiously opposed to participation in war in any form," 50 U.S.C.A.Appendix § 456(j). Such an inquiry is not easy. For though "the state of a man's mind is as much a fact as the state of his digestion," Edgington v. Fitzmaurice, 29 Ch.D. 459, 483 (1885), it is a lot less susceptible of objective determination. In discharging this unenviable task, courts must be mindful that "The range of review is the narrowest known to the law," Blalock v. United States, 4 Cir., 1957, 247 F.2d 615, 619;

1. The Court denies the request made by appellants under date of July 11, 1960, for a further postponement pending dis-position of a petition for rehearing by the Supreme Court in the Gonzales case.

that, apart from denial of procedural fairness, they may reverse the Appeal Board "only if there is no basis in fact for the classification which it gave the registrant," Estep v. United States, 1946, 327 U.S. 114, 122–123, 66 S.Ct. 423, 427, 90 L.Ed. 567; and that "any fact which casts doubt on the veracity of the registrant is relevant," Witmer v. United States, 1955, 348 U.S. 375, 381–382, 75 S.Ct. 392, 396, 99 L.Ed. 428.

### Heise

■ Under these rigorous tests Heise's conviction must be affirmed. Heise was born November 12, 1932. He had been brought up as a Lutheran. In his initial registration questionnaire, filed October 24, 1951, he did not claim to be a conscientious objector. He was classified I–A, thereafter found physically unqualified and classified IV–F until February 18, 1952, then reclassified I–A on February 19, 1953. He applied for a student deferment, which he received on April 1, 1953, valid until February 1, 1954; on February 4 he was reclassified I–A. On February 8, 1954 he requested "a deferment for at least another year in order to finish my studies" at New York Community College, and asked for a hearing. This was held on February 18, 1954; the Board voted 4–0 to classify Heise as I–A. Its summary, after referring to the request for a student deferment, adds "States that he has been taking bible course studies with Jehovah's Witness group since last August."; Heise's summary puts the two grounds in the opposite order. In any event, he asked for and received a conscientious objector form (SSS Form 150).

Heise returned the form on February 27. His letter of transmittal requested a reopening of his classification "because of new evidence that would affect my status. This new evidence could not be submitted earlier because my beliefs and convictions were different. Through Bible studies and associations with Jehovah's witnesses I now have conscientious and sincere objections to participat-

ing in combatant and non-combatant military service." There followed a several page description of the Witnesses, replete with scriptural and historical references, but rather silent as to Heise's personal beliefs save for a statement of his having been impressed by attendance at the Witnesses' assembly at the Yankee Stadium in July, 1953. The letter ended by enclosing a copy of the Watchtower magazine of February, 1951, and, promising "More evidence will be supplied to you in the near future." In answering the question on Form 150 where he had received the training and acquired the belief relied on for exemption, he stated he had been "Listening to radio station WBBR for over a year and associating with Jehovah's Witnesses," and "In August, 1952, I started to attend Bible studies and other meetings at Kingdom Hall, 526 86th St., beginning August, 1953." He stated, in answer to another question, that he had "also been preaching from door to door" but that he hadn't publicly expressed his views concerning non-participation in war. A letter from three Jehovah's Witnesses ministers attested that Heise had been regularly attending study and congregational meetings since August, 1953, and "has been actively expressing his status as one of Jehovah's Witnesses from the month of November, 1953." A hearing before the Local Board on March 25, 1954, revealed that Heise had been baptized as a Witness on March 13; again the Board voted 4–0 for I–A.

The only new fact of significance added by the FBI investigation was that Heise had told instructors at the Community College in November, 1953, that he was leaving school to commence studies for the ministry but changed his mind one day later in favor of completing his course. Before the hearing officer, although Heise asserted the religious basis of his conscientious objection to be the Bible, he "was unable to point out any passage of the Bible to sustain his beliefs and constantly referred to several pages of typewritten notes which he brought with him and which apparently were a

copy of a letter sent to the Local Board under date of February 27, 1954." The hearing officer "was. not favorably impressed as to the registrant's sincerity in making his claim."

▆ It would seem that if Heise had, in fact, become a convinced conscientious objector in November, 1953, 32 C.F.R. § 1625.1(b), which we quote in the margin[2] required him promptly to advise the Local Board, see Williams v. United States, 9 Cir., 203 F.2d 85, 87–88, certiorari denied 1953, 345 U.S. 1003, 73 S.Ct. 1149, 97 L.Ed. 1408; United States v. Vincelli, 2 Cir., 1954, 215 F.2d 210, 213. Not only did he fail to do this, but his initial reaction to the I–A classification on February 4, 1954, was to request an extension of his student deferment on February 8 and again on February 18, and on February 27 he wrote the Local Board that the evidence as to his beliefs "could not be submitted earlier." The Board was thus warranted in concluding that Heise's conscientious objections had not ripened as late as February 8, even though Heise may have become interested in the Witnesses in a general way some time before. Something may, indeed, have happened to Heise between February 8 and February 18 or 27, but the Board was not bound to find it to be what Heise claimed. Sudden accessions of belief may be utterly sincere, as the memorable one on the Damascus road; but they seldom synchronize so perfectly as Heise's with external facts making them convenient, and they normally manifest themselves in expressions more deeply personal than his. The Appeal Board might likewise have regarded the concatenation of Heise's baptism and the second hearing as not wholly adventitious. There were thus sufficient "objective facts before the Appeal Board to * * * cast doubt on the sincerity of

his claim." Witmer v. United States, supra, 348 U.S. at page 382, 75 S.Ct. at page 396; see United States v. Simmons, 7 Cir., 1954, 213 F.2d 901, 905–906, reversed on other grounds 1955, 348 U.S. 397, 75 S.Ct. 397, 99 L.Ed. 453; Campbell v. United States, 4 Cir., 1955, 221 F.2d 454.

### Corliss

Corliss' appeal presents a quite different case. Here there was no such belated conversion as in the cases of Heise or, as we shall see, of Herold. When Corliss filed his classification questionnaire on April 2, 1952, shortly after becoming 18, he claimed to be a conscientious objector and requested Selective Service Form 150. The Local Board immediately classified him I–A. On November 30, 1953, the Board mailed him the Form 150 which he duly returned. A statement annexed to the Form recited that in November, 1945, a Jehovah's Witness came to the Corliss home and told Corliss' parents about the Witnesses' faith; that Corliss' father immediately started home Bible study, conducted by a minister of the Witnesses, at which the entire family studied; that within weeks they began to attend public sermons and Watchtower study on Sunday afternoons and by the summer of 1946 were attending theocratic ministry school and service meetings on Friday nights; that in June, 1952, his father was baptized and became a Jehovah's Witnesses' minister; and that Corliss was pursuing studies intended to enable him to do so. The Form was supported by letters from two Jehovah's Witnesses ministers and from two friends. A hearing was held on February 2, 1954, at which Corliss appeared; the Board voted 4–0 to adhere to the I–A classification. The FBI investigative report confirmed that "references believe that registrant is a sincere and active adherent of the Watchtower Bible

2. "(b) Each classified registrant and each person who has filed a request for the registrant's deferment shall, within 10 days after it occurs, report to the local board in writing any fact that might result in the registrant being placed in a different classification such as, but not limited to, any change in his occupational, marital, military, or dependency status, or in his physical condition. Any other person should report to the local board in writing any such fact within 10 days after having knowledge thereof."

and Tract Society"; no adverse information was developed save for the admitted fact that Corliss had not himself been baptized in the Witnesses' faith.

The hearing officer's report states that Corliss, although admitting that he was not yet an ordained minister of the Witnesses, "asked for his conscientious-objector classification because he should devote more time to Jehovah's work of preaching the Gospel." If this had stood alone, Corliss' claim would not have been made out, Tomlinson v. United States, 9 Cir., 1954, 216 F.2d 12, 18, certiorari denied 1955, 348 U.S. 970, 75 S.Ct. 528, 99 L.Ed. 755. However, the report further recites testimony by Corliss "that long before, when he was seven or eight years old, he had decided he would not go into the army and he realized that the time had come to do something about it"; that he had first thought he would go into some noncombatant branch but now "would not feel right about giving his allegiance even in that capacity as he owes his allegiance to God rather than to a nation." An unidentified accompanying witness stated that when Corliss "was confronted with the decision to serve, he was faced with the decision whether to bear arms and realized that it was wrong to kill"; "that he [the witness] felt that registrant is sincere but is confused; that the registrant does not want to kill or take part in worldly conflicts but would try to protect himself; that if he killed with intent to do so it would be held against him." The hearing officer found that while Corliss impressed him as "being sincere in his devotion to his religious sect and the principles for which it stands, he did not appear to have a genuine, personal conviction as to why he should not bear arms or participate in war."

In a letter dated July 16, 1956 to the Appeal Board following receipt of the adverse recommendation of the Department of Justice, Corliss developed, in much greater detail than theretofore, his belief that for him to desert God's spiritual army "and join this world in its fights would be disloyalty to God and Christ. It would deserve to be punished with destruction without any hope of life in the righteous new world." Dealing with the hearing officer's statement that he was not yet a baptized member or ordained minister, he explained that baptism was "an outward symbol or testimony before witnesses of the baptized ones complete, unconditional, dedication and agreement to do the will of Jehovah God"; and that "Up to this time I have not yet felt prepared to take this important step but I am fully convinced in my own mind that I must openly show my dedication * * *" The Appeal Board unanimously classified him I–A.

Many of the arguments on which the government seeks to support the determination of the Appeal Board are unimpressive. The government stresses a statement in the appeal agent's summary of the hearing before the Local Board that Corliss "is presently studying the scriptures in order to become a full-fledged member of the Jehovah Witnesses" as indicating that he was not then in fact a Witness; but when the summary is read in context, it must be deemed to refer to the statements in the questionnaire and accompanying answers that Corliss had not yet completed his studies for the ministry. Along the same lines, the government emphasizes Corliss' statement in his letter to the Appeal Board that he had not yet felt prepared to take the important step of baptism; again the context makes it plain that Corliss regarded this as equivalent to initiation into the ministry and the statement strikes us as a display of candor rather than the reverse. The government seizes upon the statement of the unidentified witness who accompanied Corliss before the hearing officer that Corliss was "confused"; this again could well have referred to Corliss' unwillingness to be baptized and, like the statement dealt with in Parr v. United States, 9 Cir., 1959, 272 F.2d 416, 420, "is worthless for any bearing it may have upon appellant's sincerity in objecting to military service," without more knowledge of the witness' standard of clarity

than the record gives. The government urges allegedly unsatisfactory responses by Corliss as to reasons for his unwillingness to render noncombatant service; even if the criticisms were justified, which we doubt, they would not support a I–A classification. Argument is also made on the basis of Corliss' statement to the hearing officer that he had first formulated an intention not to go into the army when he was 7 or 8 years old, whereas he did not become interested in the Witnesses until he was 12; surely eight years of membership thereafter were enough for a fusion of any childish views with views based on "religious training and belief."

Nevertheless we feel constrained to sustain the conviction. Witmer v. United States, supra, 348 U.S. at page 381, 75 S.Ct. at page 396, teaches that where the claim for exemption arises under the conscientious objector provision of § 6(j) of the Universal Military Training and Service Act, 50 U.S.C.A. Appendix, § 456, as distinguished from the ministerial exemption of § 6(g), "the registrant cannot make out a prima facie case from objective facts alone, because the ultimate question in conscientious objector cases is the sincerity of the registrant in objecting, on religious grounds, to participation in war in any form. In these cases, objective facts are relevant only insofar as they help in determining the sincerity of the registrant in his claimed belief, purely a subjective question." It would seem to follow that although denial of exemption may be and often is supported by objective facts inconsistent with the claim, denial may also rest on a disbelief in the sincerity of the claim, unaccompanied by any inconsistent facts, provided the disbelief is honest and rational.

We see no reason to suppose that the Supreme Court's reversal, 1955, 348 U.S. 397, 75 S.Ct. 397, 99 L.Ed. 453, of United States v. Simmons, supra, on a procedural ground, reflected adversely on the statement of the Court of Appeals that the best evidence on a registrant's sincerity "may well be, not the man's statements or those of other witnesses, but his credibility and demeanor in a personal appearance before the fact-finding agency.", 213 F.2d at page 904, see, accord, White v. United States, 9 Cir., 1954, 215 F.2d 782, 786, certiorari denied 1955, 348 U.S. 970, 75 S.Ct. 528, 99 L.Ed. 755—a rule long recognized in cases of other sorts. United States v. Darton, C.C.D.Mich.1853, 25 Fed.Cas. 767, 770, No. 14,919; see Broadcast Music, Inc. v. Havana Madrid Restaurant Corp., 2 Cir., 1949, 175 F.2d 77, 80.[3] Neither do we see any logical basis for limiting this rule of according weight to the observations of the registrant by the Local Board and the hearing officer to cases where there are issues of veracity as to some subsidiary fact, as against a case, like Corliss', where the only real issue is the ultimate one of the sincerity of his conscientious opposition to participation in war in any form by reason of religious training and belief. To do so would make mere parroting suffice, at least if it antedated the draft call long enough and if it was not accompanied by inconsistent conduct or demonstrable prevarication as to subsidiary facts. On the other hand, to sustain the denial of a claim on a mere *ipse dixit* of lack of sincerity from the Local Board or the hearing officer would create serious possibilities of abuse. Here the judicial task, difficult in any case, becomes harder still. The Court in effect must determine, as best it can, whether the Local Board or the hearing officer and, ultimately, the

---

3. We do not regard Parr v. United States, supra, as to the contrary. Apart from the fact that Judge Pope wrote the opinions in both White and Parr, Parr had never appeared in person before the Local Board, and the Court found it "plain that the author of the Department of Justice letter of advice to the appeal board based his conclusions solely upon what he found in the Selective Service record of the registrant," 272 F.2d at page 422, rather than, as here, upon the impression of the registrant formed by the hearing officer after a personal appearance.

Appeal Board were rational and sincere in disbelieving the sincerity of registrant's belief in the absence of conduct inconsistent with the registrant's assertion, and this on a record always cold and often thin.[4] The dilemma is a cruel one; we resolve it for this case by finding enough in the printed record to support the determination of lack of sincerity of conscientious objection even though Corliss' association with the Witnesses long antedated his liability for military service and there was no evidence of conduct inconsistent with his claim of sympathy with that sect.

 The statute requires the registrant to demonstrate two elements—personal conscientious opposition to participation in war in any form, and the source of such opposition in "religious training and belief" as there defined. Neither suffices without the other. As said in United States v. Simmons, supra, 213 F.2d at pages 904–905:

"Affiliation with a particular religious sect does not *per se* entitle a registrant to conscientious objector status. The duty imposed on the boards is to determine subjectively and objectively the sincerity of the individual's belief, not the nature of the teachings of any religious faith. Each case must stand or fall on its own facts."

While the statement attached to Corliss' Form 150 described much of the theology of Jehovah's Witnesses and of Corliss' association with the Witnesses, the answers seem more learned than personal. Of course, no adverse inference can be drawn from some display of knowledge of the Scriptures, a characteristic of heretical Christian sects at least since the thirteenth century,[5] but what was important here was not what the Bible says but what Richard Secor Corliss had derived from his study of it. A possible explanation of this impersonal quality of Corliss' answers was developed at the Department of Justice hearing where he admitted he had been assisted by his father in preparing the SSS Form 150 "due to his unfamiliarity with the location of Scripture necessary to support his statements." Although there is nothing wrong in a registrant's obtaining assistance, the hearing officer might have drawn the inference that not only were the references the father's but perhaps the thoughts as well. On the other side, one of the reference letters by a friend recited Corliss' expressions of personal religious views that he "would never engage in combat or give his allegiance to any political group," and the other does so less explicitly; also, for aught we know, a good deal may have been said on the subject in the February 1, 1951 issue of Watchtower which Corliss annexed to the questionnaire. However, the letters of the two ministers are silent on this subject and the Board could reasonably have thought that neither the letters of friends nor the attachment of a periodical performed the office of a personal avowal. Not until we come to Corliss' letter of July 16, 1956 to the Appeal Board do we find a full statement of the basis for his conscientious objection to military service. The Appeal Board would have been free to overturn the action of the Local Board and the recommendation of the Department of Justice on this ground or others, United States v. Pitt, 3 Cir., 1944, 144 F.2d 169, 172, but it could just as rationally have deemed this belated expression to reflect adversely on Corliss' sincerity as to support it. We think, therefore, there is enough, although barely enough, to sustain a determination that, in the language of the hearing officer, although Corliss was "sincere in his devotion to his religious sect and the principles for which it stands, he did not appear to have a genuine personal conviction as to why

---

4. The problem of the Appeal Board itself is not altogether different, although the Board may be aided by a more ample record, previous experience with the Local Board and the hearing officer, and its general expertise in this area.

5. See G. G. Coulton, Inquisition and Liberty, p. 184.

he should not bear arms or participate in war."

### Herold

█ Review of Herold's case shows sufficient objective facts to sustain the rejection of his claim. Born August 22, 1934, he was reared as a Lutheran. In filing his classification questionnaire in October, 1952, he made no assertion that he was a conscientious objector; he was classified I-A. Before that, in March, 1952, he had attempted to enlist in the Naval Reserve, but was rejected for physical reasons. In August, 1953, he applied for enrollment in Kings Point Military College; this would have required two years of military service after graduation, as Herold was aware. His pre-induction notice was mailed May 3, 1954. On June 1, 1954, he requested and on June 8 filed the conscientious objector SSS Form 150.

In this he alleged he had been "taking the course of study given by the Watchtower Bible and Tract Society for the past three months, using the Bible aids published by the Society"; that he did "not rely on any individual for my religious guidance but receive accurate knowledge from God's word by topical study of the Bible"; but that he had never given public expression to the views relied on as showing the basis for his claim. At the hearing before the Local Board he claimed to be a minister and put his claim solely on that ground; however, examination brought out that he merely expected to be ordained. Amato, a Jehovah's Witnesses minister, who was one of Herold's references, asserted Herold "is entitled to deferment as any secular would be going through the seminary"; in this he was mistaken, since the statute, 50 U.S.C.A.Appendix, § 456(g), grants the student exemption only to those "pursuing full-time courses of instruction in recognized theological or divinity schools" or "full-time courses of instruction leading to their entrance into recognized theological or divinity schools in which they have been pre-enrolled."

The hearing officer was adversely impressed by the synchronization of Herold's interest in the Witnesses and the notice of induction. He also found that "in testifying as to his study of the Bible being the basis for his claimed belief as a conscientious objector, the registrant showed a complete lack of knowledge and understanding of the Bible and the passages which he quoted from the written notes which he brought with him to the hearing." The officer noted that a young lady who accompanied Herold to this hearing, as she had before the Local Board, "attempted to prompt the registrant in his answers with reference to the questions concerning the Bible"; although the officer may have had no basis for his assumption as to marital intentions of the pair and the young lady's desire to assist on that account, this does not necessarily eliminate the inference that the sentiments that Herold was voicing may have been predominantly hers rather than his. Herold's answer to the Department's adverse recommendation, "What lawyer presents his case in court without first preparing an outline, or minister gives a sermon without a written outline?", may also have had an effect on the Appeal Board opposite to that intended; sincere persons do not normally prepare "outlines" of deeply held personal beliefs, and there was also the question whether the "outline" had been prepared by Herold or someone else.

█ Herold asserts two claims of procedural unfairness. The first is that the Local Board displayed a degree of prejudice that infected the entire proceeding. While the questioning did become somewhat heated, many of the passages, when read in context, do not seem to have the sinister significance that appellant gives them. In any event, we are here reviewing the action of the Appeal Board, which had the record of the Local Board before it, and was as able to detect prejudice on the part of the Local Board as we are. It is settled that where there is no evidence that the Appeal Board has been misled, unfair conduct by mem-

bers of the Local Board will not upset a classification. Cramer v. France, 9 Cir., 1945, 148 F.2d 801, 804–805; Davis v. United States, 8 Cir., 203 F.2d 853, certiorari denied 1953, 345 U.S. 996, 73 S.Ct. 1138, 97 L.Ed. 1403; Reed v. United States, 9 Cir., 1953, 205 F.2d 216, certiorari denied 1953, 346 U.S. 908, 74 S.Ct. 238, 98 L.Ed. 406; Falbo v. United States, 1944, 320 U.S. 549, 555, 64 S.Ct. 346, 349, 88 L.Ed. 305, concurring opinion of Mr. Justice Rutledge. Cases where the Local Board had applied an erroneous test and it is impossible to tell whether the Appeal Board relied upon this, e. g., United States v. Stepler, 3 Cir., 1958, 258 F.2d 310, 316; Niznik v. United States, 6 Cir., 1950, 184 F.2d 972; and Mintz v. Howlett, 2 Cir., 1953, 207 F.2d 758, are distinguishable. See United States v. Chodorski, 7 Cir., 1956, 240 F.2d 590, 592–593, certiorari denied 1957, 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 858.

Herold's other procedural point relates to the inclusion in his file of a letter to the Appeal Board, the existence of which allegedly was not disclosed to Herold. The letter, commenting on the recommendation of the Department of Justice, came from Arthur Waugh, Assistant National Director, Department of Americanism, Regular Veterans Association—a Catholic and former Navy man. The general tenor of the letter was highly favorable, stressing Herold's sincerity, endeavoring to explain away his application for Kings Point Military College, and challenging the hearing officer's conclusion as to the serious intentions of the young lady, previously a member of Waugh's household who, Waugh stated, "is now 17, wants to see a bit of the world and life prior to marriage and is actively engaged in 'looking over the field.'" The one thing in Waugh's letter now claimed to have been prejudicial is that, in the course of asserting Herold's sincerity, Waugh said that Herold "was in Witness work in about 1951 or 1952 but was not then a 'preacher' nor one of their speakers"—he "may have began serving as a 'preacher' in February 1954, but went to Witness meetings long prior to that." This, it is asserted, might have had a boomerang effect in view of Herold's attempt to enlist in the Naval Reserve in March, 1952, his failure to claim conscientious objection in October, 1952, his application for Kings Point in October, 1953, and his own statement that his taking "the course of study given by the Watchtower Bible and Tract Society" had begun only in April, 1954. The government contends the Appeal Board must be presumed not to have considered the letter in view of the Regulation, 32 C.F.R. § 1626.24(b), which forbids this; appellant counters with the Appeal Board's statement that its review had included "all other documents contained in the Cover Sheet." We conclude that Herold has not made a showing of prejudice from the inclusion of Waugh's letter in his file sufficient to warrant reversal, cf. 5 U.S.C.A. § 1009(b) and (e). There was no such inconsistency between the statements of Herold's having attended Witness meetings in 1951 or 1952 and his later statements and actions as is claimed; if the Appeal Board considered Waugh's letter at all, its effect would have been helpful to Herold rather than the reverse. United States ex rel. De-Graw v. Toon, 2 Cir., 1945, 151 F.2d 778, on which appellant relies, is worlds apart from this case.

Judgment affirmed.