**Albert V. FRISBY, Petitioner,**

v.

**General Stanley LARSEN, etc., et al.,
Respondents.**

**No. C-71-797.**

United States District Court,
N. D. California.

Aug. 4, 1971.

Richard L. Romano, San Francisco, Cal., for petitioner.

James L. Browning, Jr., U. S. Atty., San Francisco, Cal., with Janet Aitken, Asst. U. S. Atty., appearing and Malcolm E. McLorg, Captain, U. S. Army, for respondents.

1. Hammond v. Lenfest, 398 F.2d 705 (2 Cir. 1968) ; Bates v. Commander, etc., 413 F.2d 475 (1 Cir. 1969).

## ORDER GRANTING WRIT OF HABEAS CORPUS

WOLLENBERG, District Judge.

Petitioner Albert Frisby was inducted into the United States Army on June 8, 1970. After basic training at Fort Leonard Wood, Missouri, he was sent to Fort Ord, California, for advanced infantry training. He then applied for conscientious objector status with the provision that he would continue in the Army as a non-combatant. This application was approved in early December, 1970. Petitioner, in the meantime, had determined that his convictions would not permit serving the military in *any* capacity, so he applied for an outright discharge under AR 635–20. The denial of this second application presents the Court with issues which, for all the frequency with which they come before the judiciary, have yet to be clearly resolved.

■ The task of the Court in reviewing a denial of an in-service conscientious objector application is to determine (1) if the application stated a *prima facie* case for the status requested; (2) if the application was handled in a procedurally correct manner; (3) if legally adequate reasons were stated for the denial of the request; and (4) if there was a "basis in fact" supporting the reasons given.[1]

No one contests the procedures used by the Army herein; nor is there any doubt that petitioner stated a *prima facie* case for the status he sought. Albert Frisby was born and raised in Independence, Missouri, and was given a strongly religious upbringing. He studied biology at the Stephen F. Austin State University in Texas, after which he became a high school biology teacher in Turner, Kansas. His early Christian training and later scientific endeavors have both contributed to his present beliefs, which were expressed by his applications in a manner both simple and on occasion eloquent.[2] The eight letters of

2. "There is indeed a power which initiated life many millions of years ago * * *. The power arranged the birth of earth

reference written on behalf of petitioner attest to his sincerity all the more persuasively for their unpretentiousness.[3]

The case thus made by petitioner was one of unusual strength, and the Army speedily approved his initial application for reassignment to non-combatant duties. But the same applicant who was found sincere in November, 1970, was found insincere by the officer who heard his second application three months later. The reasons given by that officer, Captain Heming, in his memorandum of February 17, 1971, were incorporated as the rationale of the Conscientious Objector Review Board which ultimately denied his application for separation.

Captain Heming—and the Board—found the applicant insincere due to (1) his demeanor at the interview with Heming; (2) the suddenness of his decision regarding his inability to conscientiously perform even non-combatant duties; (3) his answers during the hearing, "which seemed to be more a product of rote learning than a sincere effort to answer difficult questions"; (4) Heming's conclusion that Frisby felt that "it would be nice to be out of the military".

The most simple and all-pervasive concepts sometimes bear repetition. A court constituted under Article III of the Constitution, when asked to uphold an agency finding in the course of a criminal prosecution or habeas corpus proceeding, must assure itself that the agency has met certain minima grounded in the constitutional inability of any governmental organ to base its decisions on illegal motives or on whim and caprice.[4] Thus decisions must be found to be both reasoned and reasonable. If

and all the basic elements for introducing one-celled life. From thereon, organic evolution produced what we have now. The Instigator initiated the process; life evolved on its own. These fascinating events should be *appreciated* and *honored* by all capable of doing so. There is a responsibility of every thinking organism to concern himself with the preservation of life. Life is of the supreme order and should be treated as such—nothing is more sacred * * *.

"Only my mother was of a highly religious nature—my sister and I profited from her belief. Every Sunday she went to church with us until we were old enough to start making our own decisions. At the age of fifteen, I broke away, as numerous young people do, to search for my own beliefs * * *.

"It was one fall night of 1967 at the Stephen F. Austin State University chemical building that finally prompted my new thinking. This was a biology class and we were dissecting a shark for further understanding of the blood system. As I was uncovering the vessels, the marvel of what I saw began a new way of life. This single moment was the parent of my new religion—the vessels were *very* organized, displayed in a manner much li[k]e railroad junctions in a well-organized railroad yard. I couldn't fully begin to describe the feeling which approached me. *There* was physical evidence of a superior power * * * we can all look around us and observe the Power's work, but we tend to overlook

the obvious—it just doesn't sink in." Respondents' Exhibit A, pp. 15–17; emphasis in original.

3. "His mother, being a woman of prayer, taught Albert how to live according to Christ's principles, loving others as himself. She taught Sunday School in the First Christian Church, taking her son * * * with her each Sunday for years." Respondents' Exhibit A, page 32.

"Such young men as Albert cause those of us who are more mature in years to keep faith with our youth * * * despite the many youthful rebels who claim so many of our headlines today". *Id.* at page 34.

"Al is a good, clean wholesome young man. He doesn't swear and has attended church." *Id.* at page 35.

"I felt he was the kind of boy I wanted my son to be with." *Id.* at page 36.

"I have found him to be morally sound, religious and patriotic * * *." *Id.* at page 38.

4. "Local boards are not courts of law and are not bound by traditional rules of evidence; they are given great leeway in hearing and considering a variety of material as evidence. * * * However, the courts may properly insist that there be some proof that is incompatible with the registrant's proof of exemption. * * * [To do otherwise] is both contrary to the spirit of the Act and foreign to our concepts of justice." Dickinson v. United States, 346 U.S. 389, 396, 74 S.Ct. 152, 157, 98 L.Ed. 132 (1953).

the agency does not state reasons, judicial review is difficult or impossible,[5] and if the reasons, though stated, are without support in the evidence, the decision reached by the agency can only be irrational, and as such cannot be given effect by an Article III court. The above philosophy applies alike to judicial review of legislative classifications,[6] criminal convictions,[7] agency rulings,[8] prison regulations,[9] and to denials of selective service classifications.[10] Congress has often broadened the scope of judicial scrutiny but it has seldom if ever succeeded in reducing it below this minimum.[11]

■ All of this goes to the reasons and evidence adduced by the government herein. The conclusionary references to "rote learning", "demeanor" and to petitioner's subjective desire "to get out of the Army" are neither reasons nor evidence supporting the denial of his application. The *written* record tells us nothing of applicant's demeanor, and shows nothing that is mechanical or rehearsed about petitioner's expression of his own beliefs. See United States v. Jagla, 330 F.Supp. 962 (N.D.Cal.1970); see also United States v. Newton, 435 F.2d 671 (9 Cir.1970).

■ Counsel for respondents spends considerable time contesting petitioner's interpretation of FM 8–10, a standard reference for Army medical corpsmen. In explaining why he had concluded that even service as a medic would compromise his convictions, petitioner had cited certain passages in FM 8–10 which, to him, indicated that a significant part of the medic's mission was to promote the Army's combat goals. Counsel for the government calls this interpretation of the manual "fatuous". The argument is misplaced. Respondents must be concerned with the nature and sincerity of an applicant's beliefs, not with their objective truth. United States v. Seeger, 380 U.S. 163, 184–185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). Perhaps if an interpretation of an Army manual were so patently absurd that no reasonable man could sincerely hold it, we might entertain the government's argument. But the Court, having read the relevant passages in FM 8–10 cannot say that this is the situation here. See respondents' Exhibit A, pages 18–20.

Captain Heming's observation regarding the timing of the two applications is relevant to the contention that there is a "basis in fact" for a finding of insincerity. The Court of Appeals for this circuit has not yet, however, said that timing, taken alone and without reference to the rest of the evidence in the record, .

5. Clay v. United States, 403 U.S. 698, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971); United States v. Haughton, 413 F.2d 736 (9 Cir. 1969).

6. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); Romero v. Hodgson, 319 F.Supp. 1201 (N.D.Cal.1970), aff'd 403 U.S. 901, 91 S.Ct. 2215, 29 L.Ed.2d 678 (1971).

7. Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).

8. See Davis, Administrative Law Treatise, Ch. 29 (1958).

9. Jackson v. Godwin, 400 F.2d 529 (3 Cir. 1968); Pierce v. LaVallee, 293 F.2d 233 (Cir. 1961); Gilmore v. Lynch, 326 F. Supp. 330 (N.D.Cal. April 1, 1971).

10. Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946); Dickinson v. United States, *supra*, note 4.

11. "Once it is held that Congress can require the courts criminally to enforce unconstitutional laws or statutes, including regulations, or to do so without regard to their validity, the way will have been found to circumvent the supreme law and, what is more, to make the courts parties to doing so. This Congress cannot do. * * *" Yakus v. United States, 321 U.S. 414, 468, 64 S.Ct. 660, 688, 88 L.Ed. 834 (1944) (Rutledge & Murphy, JJ. Dissenting), cited with approval in Currie, Federal Courts 96 (1968). The rationale applies with equal vigor to a situation where the courts are asked to enforce arbitrary or capricious agency fact findings. See also Hart, The Power of Congress to Limit the Jurisdiction of the Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362 (1953).

fulfills the due process requirement that an agency decision must be reasonable. See Speer v. Hedrick, 419 F.2d 804 (9 Cir. 1969); Zemke v. Larsen, 434 F.2d 1281 (9th Cir. Dec. 1, 1970) (footnote 1).

The specific point can be resolved only be reference to the more general philosophy of *Estep, Dickinson,* and the "basis in fact" test. Some courts seem to require only a sort of mechanical culling of the record for "some" evidence, however weak, to support the agency finding.[12] But other courts, when faced with a record on the basis of which no "reasoning mind" [13] could agree with the agency, have required that the "basis in fact" be "rational",[14] consist of "hard, provable, reliable facts",[15] and be evaluated with reference to the strength of countervailing evidence in the record.[16]

This Court will follow the latter precedents; the alternative would do violence to its higher obligation to uphold the Constitution and protect the applicant herein from official caprice or malice. For, *taken in context,* the timing of Frisby's second application is but a bare wisp of evidence supporting a finding of insincerity. The evidence of sincerity —the strong prima facie case, the many letters of reference, the initial grant of reassignment to non-combatant duties, and the applicant's explanation of his maturing beliefs [17]—overwhelms the thin straw on which the government leans. No reasonable man, on the basis of the *whole* record herein, could find Frisby insincere.

Accordingly, it is hereby ordered that the writ of habeas corpus be granted, and that petitioner be released from the custody of respondents forthwith.

12. See Parrott v. United States, 370 F.2d 388, 391 (9 Cir. 1966); Rosengart v. Laird, 449 F.2d 523 (2d Cir. 1971) (Lumbard, J., dissenting).

13. See L. Jaffe, Judicial Control of Administrative Action 596 (1965), as quoted in Hansen, The Basis-in-Fact Test, etc., 37 Brooklyn L.Rev. 453 (1971).

14. United States v. Hesse, 417 F.2d 141, 143 (8 Cir. 1969), citing United States v. Corliss, 280 F.2d 808, 814 (2 Cir. 1960).

15. Helwick v. Laird, 438 F.2d 959, 963 (5 Cir. 1971).

16. Shirer v. Hackel, 330 F.Supp. 369 (N. D.Cal.1970); followed in Franklin v. Williams, No. C 70 2748, 4 SSLR 3045 (N.D.Cal.1971).

17. The timing argument as brought here is a treacherous concept indeed. The Court, after all, is not dealing with a man who *delayed* filing his application until after assignment to a combat zone (see Speer v. Hedrick, cit. *supra*), but with one who *hastened* to file it as soon as his beliefs matured. Applicant's basic philosophy had not changed; only his conception of the mission of the Army Medical Corps had altered. Other corpsmen have come to the same conclusion, and have been vindicated by the courts. E. g. Helwick v. Laird, cit. *supra* note 15. Far from being a Damascene conversion, petitioner's second application represented no more than the maturation which is inherent in the nature of conscientious objection. United States v. Newton, 435 F.2d 671, 674 (9 Cir. 1970).