Thomas C. O'HARA

v.

Melvin LAIRD, Secretary of Defense, et al.

Civ. A. No. 4763.

United States District Court, D. Rhode Island.

March 9, 1972.

---

Bernard M. Grossberg, John M. Roney, R. I. Legal Services, Inc., Providence, R. I., for plaintiff.

Lincoln C. Almond, U. S. Atty., and Constance L. Messore, Asst. U. S. Atty., Providence, R. I., for defendants.

## OPINION

PETTINE, Chief Judge.

This action is a petition for a writ of habeas corpus directed against the respondents seeking petitioner's release from the United States Army as a conscientious objector.

### Jurisdiction

Jurisdiction is founded on 28 U.S.C. §§ 2241(a), 2241(c) (1), and 2241(c) (3). The petitioner and respondent Colonel Charles F. Means are present in the District of Rhode Island and the respondents Secretary of the Army and Secretary of Defense are subject to the jurisdiction of this court.[1]

### Findings of Fact

Certain documents from the file of the petitioner pertaining to his application for discharge as a conscientious objector were placed in evidence by stipulation of the parties, who then submitted briefs on which they now rest. The facts are taken from these exhibits and memoranda submitted to the Court. There

1. Jurisdiction is conceded by the Government.

are no material variances in the factual positions of the Government and the petitioner.

The petitioner, a citizen of the United States and resident of Rhode Island, was drafted into the United States Army on May 12, 1969. He holds the rank of Specialist Fourth Class and is assigned to the 24th Artillery Group (Air Defense), Coventry, Rhode Island, where he works as an Information Specialist under the command of Colonel Charles F. Means, its Commanding Officer.

Upon entering the service he was assigned to Fort Lewis, Washington, to undergo basic training, which he performed with distinction, qualifying for the Infantry Non-Commissioned Officers School, Fort Benning, Georgia. Though he states that during this initial training he became confused about his position in the military, he, nevertheless, volunteered to attend and commenced this course on October 10, 1969. He explains this as follows:

"At this time, I was about one-half way through Infantry AIT. I began to feel that I needed time to think and I hoped that clarity and understanding would come with time. I volunteered for Infantry NCO School for two basic reasons. The first was that it gave more time to become aware of the cause of my uncertainties and secondly, if I decided that I could face combat that I would be better prepared because of the extra training." (Petitioner's Application)

During this training and around November 3, 1969, he attended a Character Guidance Class entitled "Morality of War," taught by an Army Chaplain, and was so affected he broke down and cried. He began to question whether or not he would be able to kill another human being. He describes this incident in his application by saying—

"During a Character Guidance Class in the initial period of my NCO training, I broke down and cried. The topic was the morality of war and killing. Suddenly, it became clearer to me that something was not allowing me to discuss a subject that I might have to face. I began to probe myself for answers to questions like: Could I kill a man? Were all of the things that I had been taught and come to believe wrong? Could my country send a man to war against his conscience? I didn't have the answers to these questions, but I did know that I could not face combat, whether it was in Viet Nam or Korea or any place, until I did have the answers. I knew that I could not be an effective leader in combat and be responsible for other's lives with my doubts and uncertainties. Adding to my confusions was the fact that I felt that I had an obligation to this country." (Petitioner's Application)

Following this incident and during the months of November and December of 1969 he spoke with the chaplain and various personnel at the Mental Hygiene Unit at Fort Benning concerning his feelings.

On or about January 10, 1970, the petitioner withdrew from the NCO School and on January 21, 1970, re-enlisted in order to avoid being sent to Vietnam. He states he did this on the advice of personnel at the Mental Hygiene Unit at Fort Benning, claiming,

"I knew that I couldn't continue in my training until I had answers to my questions, yet I knew that if I quit NCO School that I would very likely receive orders to Viet Nam without knowing if I could kill a man. My only legal alternative was reenlistment. As paradoxical and contradictory as it may seem I felt that by reenlisting I would have the time to find the answers to my questions and fulfill my military obligation while avoiding a situation that I simply couldn't face."

He was then assigned to Fort Bliss, Texas, in order to undergo Missile Crewman Training and while stationed there he was voted the "Outstanding Military Leader of his Class" by a board of officers.

On June 8, 1970, the petitioner was transferred to Battery D, 3d Battalion (HERC), 68th Artillery, Bethel, Minnesota, where he states he began to examine more closely his views on the meaning of life and death and his role as a member of the United States Army. In November he initiated the first of many conversations with a Chaplain Walter M. D. Olsen who was assigned to the 13th artillery group in St. Paul, Minnesota, and states that Chaplain Olsen began to help him articulate his feelings.

In February, 1971, after serving approximately eight months as a missile launcher crewman, the petitioner claims his thoughts and feelings about conscientious objection to continued service in the Army crystallized and during the remaining part of February, 1971, and the following month of March he began writing his application for discharge and collecting the various letters of support incident to such application. It is also acknowledged that sometime during this period he learned that the base at Bethel, Minnesota, would be closed.

On April 21, 1971, the petitioner submitted his completed application for discharge from the United States Army by reason of conscientious objection to his immediate commanding officer, Captain Daniel Petrosky, as required under Army Regulation No. 635–20, Section 4, and was then interviewed by Chaplain M. D. Olsen; Major S. Van Valkenburg, the 0–3 hearing officer; a Dr. O. H. Johnson, a psychiatrist; and his commanding officer, Captain Petrosky.

Chaplain Olsen found petitioner's application based on a "personal moral code and ethical decision" and stated " . . it is my opinion that his conscientious objection is genuine," and recommended approval of the petitioner's application for discharge; Dr. Johnson, as a result of the required psychiatric examination, reported " . . . does not appear clinically psychotic or neurotic . . "; Captain Van Valkenburg found that the petitioner's objection became fixed during February, 1971, and that he " . . appeared sincere in his beliefs which are strongly held." He recommended that the petitioner be discharged as a conscientious objector; the petitioner's battery commanding officer, Captain Petrosky found that the petitioner's application for discharge was submitted with " . . . truthful sincerity . . ." and recommended approval.

Though it was not required by the regulations, the petitioner was interviewed by Colonel Alfred N. Champion, Commanding Officer of the 13th Artillery Group, who found that petitioner's " . . . convictions against killing are not nearly so strongly held as his fear of fighting or being killed . . . ". He stated, "Specialist O'Hara will do anything to avoid the possibility of serving in a hostile fire zone. His actions since he was drafted substantiate this conclusion: he volunteered for NCO training to avoid going to Vietnam; he enlisted in USARADCOM (U. S. Army Air Defense Command) to be stabilized in the CONUS (Continental United States) for fourteen months. Now that his stabilized tour is ending he is claiming conscientious objector status." He recommended disapproval of the petitioner's application for discharge.

The application was next reviewed by the Adjutant General's Office at Second Regional Headquarters, Duluth, Minnesota, by Reviewing Officer Captain K. E. Turnquist, who recommended approval of the petitioner's application. It was then reviewed by the Army Conscientious Objector Review Board in May of 1971, and it is contended by the applicant that they recommended approval of the application. However, this is not found in record. At any rate, it does appear that for some inexplicable reason a second Conscientious Review Board was convened in June of 1971 to again consider the petitioner's application for discharge. This Board requested hearing officer Van Valkenburg to " . . expand his remarks to explain why he considers Specialist O'Hara a sincere

Conscientious Objector." The reply to this was "I am no longer able to recall further the precise comments made by him that convinced me of his sincerity."

On July 12, 1971, the Conscientious Objector Review Board rendered its opinion disapproving the petitioner's application [2].

2. Opinion of the Board in the case of Thomas C. O'Hara 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 12 July 1971

1. The member's application for discharge as a conscientious objector was considered under the provisions of Army Regulation 635-20, 31 July 1970. No vested right exists for any person to be discharged from the Army at his own request, even for conscientious objection, prior to the expiration of his term of service. Discharge for conscientious objection is at the grace of the Secretary of the Army and the applicant bears the burden of clearly establishing that he meets the requirements provided by the Secretary in the above-cited regulation. The Board finds that SP4 O'Hara has not satisfied this burden. He does not clearly establish that his conscience, spurred by deeply held moral, ethical, or religious beliefs, would give him no rest or peace if he allowed himself to remain a part of an instrument of war. This finding is based upon a combination of the following facts and conclusions supported by the record:

a. Applicant's statement in support of his request for discharge indicates that his beliefs are against the taking of another man's life. Applicant also states that he is opposed to war, presumably because of the killing involved, but applicant only specifically states that his stand is because he feels that war is not the most effective vehicle to peace. This is strictly a pragmatic and expediently based position. Although applicant indicates he cannot serve in the military because of his objections to war, he does not clearly establish that his objections to war are based on any moral, ethical or religious code which guides his life and which requires his conclusion. Applicant's primary religious, moral or ethical objection is based upon his dislike for killing. Although he indicates that he does not want to serve as a combat medic, he does not elaborate sufficiently to indicate that there are no positions in the Army in which he can serve consistent with his religious, moral or ethical convictions.

b. A further factor indicating that applicant does not possess the requisite depth of conviction is found in the fact that although applicant was drafted into the Army in May 1969, he did not submit this application for discharge as a conscientious objector until 21 April 1971, a delay which is insufficiently explained. In explaining how his professed beliefs were formed, applicant cites experiences which occurred during BCT and which raised in him moral, ethical or religious questions about his participation in the military. Yet, these were not strong enough to require an application for CO status. About halfway through Infantry AIT, applicant indicates that he had become further confused about his position in the military, yet, his reaction was to volunteer for Infantry NCO School which served to commit himself even deeper to the Army. This is not an action consistent with growing conscientious objector beliefs. Applicant then indicates that during his NCO training his conscience was so stirred during a discussion of the morality of war and killing that he broke down and cried. Yet, again instead of considering conscientious objection, applicant reenlisted in the Army thereby committing himself even further to an organization in relation to which he felt he had growing objections. Yet, even though he indicates that he reenlisted to gain time to consider his beliefs, applicant then proceeded to serve for over a year consistent with his beliefs and without giving them any apparent serious consideration. He does not indicate any experiences or activities during that year that served as a catalyst and which required him to request a discharge for conscientious objector at this time when this was not required by the strong conscience stirring experiences which occurred during his training. Applicant shows nothing to indicate that his professed beliefs are now any more deeply held than those which existed earlier and which did not require him to request a discharge from the Army as a conscientious objector. He has not clearly established that his conscience would give him no rest or peace if he allowed himself to remain a part of an instrument of war. This is also cited by the CO, 13th Arty Group, COL Champin, who recommends disapproval. After indicating that applicant's convictions against killing are not nearly as strongly held as his fear of fighting or being killed, COL Champin states, "SP4 O'Hara would do anything to avoid the possibility of serving in a hostile fire zone. His actions since he was drafted substantiate this conclusion: he volunteered for NCO training to avoid going to Vietnam; he enlisted for USARADCOM

## Conclusions of Law

Preliminarily, there is no doubt that this case is properly before this court and that the decision of the Conscientious Objector Review Board (hereinafter the Board) has ripened for judicial review.

"The scope of judicial review in habeas corpus actions by members of the armed forces seeking discharge as conscientious objectors pursuant to sec. 6(j) of the Military Selective Service Act of 1967 (50 U.S.C.A. App. sec. 456(j)) is narrowly limited to the single question of whether there was a basis in fact for denying the claim. If such basis exists, then I cannot upset the [army's] administrative decision even if I would reach a different result if I were reviewing all the evidence de novo" Bouthillette v. Commanding Officer, Newport Naval Base D. C., 318 F.Supp. 1143, 1148–1149. (*Bouthillette*)

The controlling Department of Defense Directive (hereinafter DoD 1300.6) issued under the authority of Section 6 (j), supra, exempts any person from combatant service " . . . who by religious training and belief is conscientiously opposed to participation in war in any form." [3] It establishes uniform policies and procedures providing for administrative discharges prior to completion of an obligated term of service. This is " . . . discretionary with the military Service concerned, based on judgment of the facts and circumstances in the case." Section IV B. ·

Here we are dealing with a petitioner whose request for discharge is based on conscientious objection coming into being subsequent to induction, thus falling squarely within the four corners of the regulation cited, supra.

The government argues that the Board in denying the petitioner's request for discharge stated a good and sufficient legal reason, namely *insincerity*, and bottoms this conclusion on the Army's wording in its denial that, "applicant lacks the *depth of conviction* required to qualify for discharge as a conscientious objector." (emphasis added) It cites in support of its position Wheeler v. Laird 4 SSLR 3128; Hanson v. Resor 4 SSLR 3611; and Trombley v. Secretary of Defense 4 SSLR 3699; further the government quotes the following language from Welsh v. United States 398 U.S. 333, 342–343, 90 S.Ct. 1798 (1970) (*Welsh*):

"The two groups of registrants that obviously do fall within these exclusions from the exemption [provided by Sec. 6(j)] are those whose *beliefs are not deeply held* and those whose

---

to be stabilized in the CONUS for fourteen months. Now that his stabilized tour is ending he is claiming conscientious objector status."

c. In reaching its conclusions, the Board has fully considered the recommended approval by applicant's battery commander. Although indicating that applicant is sincere, the statement does not explain applicant's apparently inconsistent actions and delays in submitting this application or indicate that applicant could not serve in the military in any capacity because of deeply held moral, ethical or religious convictions. The Board also notes that applicant's commanding general recommends approval but gives no reasons to support that recommendation. The Board has also fully considered the favorable recommendations by the hearing officer and the favorable statements of the interviewing chaplain. The Board has also noted the letters submitted in support of this application. Although they indicate that applicant is sincere, they do not submit sufficient information to explain the matters discussed above and to show that, because of deeply held moral, ethical or religious convictions, applicant cannot serve in any capacity in the military.

2. *Action by the Board*
   Disapproval

                    C. M. MASTROPOOL
                    Major, AGC
                    Recorder

See also Note 5, infra, for petitioner's application.

3. See new DoD 1300.6 revised August 20, 1971, effective October 19, 1971 incorporating definition of "religious training and belief" articulated in Welsh v. United States 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).

objection to war does not rest at all upon moral, ethical, or religious principle, but instead rests solely upon considerations of policy, *pragmatism or expediency*." (emphasis supplied).

■ I find the government's position untenable and clear error. "While an applicant's credibility is certainly a permissible factor for evaluation of an in-service conscientious objector claim,[4] and although a Military Department does not have to accept at face value an applicant's statements, a finding of lack of credibility itself must have some basis in fact in order to withstand judicial scrutiny." *Bouthillette, supra* at p. 1150–1151.

In this case the Board has seen fit to take isolated portions of the petitioner's statement of beliefs and premised them for unwarranted conclusions. For example, it states that the petitioner's belief against taking another man's life and opposition to war because it will not obtain peace amounts to nothing more than saying that war is not the most effective vehicle to peace and therefor is a "pragmatic and expediently" based position (*Welsh*, supra). The Board also states the petitioner does not clearly establish that his objections to war are based on any "moral, ethical or religious" code which guides his life (*Welsh*, supra) because "applicants primary religious, moral or ethical objection is based upon his dislike for killing." It fails to recognize the totality of the petitioner's statement, which, to this court, clearly sets forth a sincere pronouncement of opposition to all wars because of a moral and ethical belief held ". . . with the strength of traditional religious convictions" and arrived at subsequent to enlistment in the service. He fully qualifies as a conscien-

tious objector as defined in *Welsh*, supra.

"The Court made it clear that these sincere and meaningful beliefs that prompt the registrant's objection to all wars need not be confined in either source or content to traditional or parochial concepts of religion. It held that § 6(j) 'does not distinguish between externally and internally derived beliefs,' *id.*, at 186 [85 S.Ct. at 864] and also held that 'intensely personal' convictions which some might find 'incomprehensible' or 'incorrect' come within the meaning of 'religious belief' in the Act. *Id.*, at 184–85 [85 S.Ct. at 863–864]. What is necessary under Seeger for a registrant's conscientious objection to all war to be 'religious' within the meaning of § 6(j) is that this opposition to war stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions." (398 U.S. at 339–340, 90 S.Ct. at 1796, 26 L.Ed.2d 308)

As the petitioner has argued in his brief to this Court, "The Army's task 'is to decide whether the beliefs professed by a petitioner are sincerely held and whether they are, in his own scheme of things religious.' United States v. Seeger, *supra*, at 185. [380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)] (Emphasis added) The controlling determination is whether his beliefs fulfill the role of a religion and function as such in the petitioner's life. 'The test might be stated in these words: A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the ex-

---

4. DoD 1300.6 V A (2):

"The criteria for determining conscientious objection are not absolute objective measurements which can be applied across the board, but are the result of extensive experience and practices which have been upheld in the Courts in connection with

legal obligations for service. Factors to be considered in determining a person's claim of conscientious objection include * * * (2) the credibility of the claimant and the credibility of persons supporting the claim."

emption comes within the statutory definition.' United States v. Seeger, *supra*, at 176. [85 S.Ct. 850]

'If an individual deeply and sincerely holds beliefs which are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of that individual a place parallel to that filled by . . . God' in traditionally religious persons. Because his beliefs function as a religion in his life, such an individual is as much entitled to a 'religious' conscientious objection exemption under .6(j) as is someone who derives his conscientious opposition to war from traditional religious convictions.' Welsh v. United States, *supra*, 398 U.S. at 340, 90 S.Ct. 1792."

This brings us to an analysis of the petitioner's application.[5] I have foot-

---

5. Application for Discharge by Reason of Conscientious Objection

b. Religious training or beliefs held

(1) *I believe that life is the most revered and loved possession that God has given to man. I believe that God gave us life so that we could learn, create, and improve ourselves and our world. I do not believe that God intended for us to destroy our ability to learn, our feeling for creativity and our desire to improve. I believe that God created man to live in peace and not to kill and wage war on each other. I cannot see war, any war, as a vehicle that delivers peace to this world but rather as a vehicle of destruction, violence and death.* War is not a panacea for this or any generations injustices and conflicts. I believe that if man would work for peace as diligently and totally as he wages war, that our world may well be able to live in peace. I hope that as Pope John stated in his encyclical *Pacem in Terris*, "Men are becoming more and more convinced that disputes which arise between states should not be resolved by recourse to arms, but rather by negotiation." *My term of service in the Army has been one of increasing compromise to my conscience.* I have come to view the Army as an agent who's product is death. The Army is to me, an organization that by its design is dedicated to the killing of human beings. *Even the combat medics ultimate objective is to win the battles.* As stated in Army Field Manual FM 8–10, the mission of the Army Medical Service is "a supporting service of the combat elements of the Army primarily concerned with the maintenance of the health and fighting efficiency of the troops." While the medic does save lives and often in a heroic manner, his job calls for him "to contribute directly to the military effort by providing adequate medical treatment and rapid orderly evacuation for the sick and wounded." The combat medic does support the military effort, which is, dedicated to the killing of human beings. For this reason, I could not accept a noncombatant role in the Army. While my religious beliefs do not often lead to my attendance at church services of functions, I feel that my claim as a conscientious objector is one based on a sincere and honest set of religious and moral values. *I believe that we all must begin to search our souls to find the truth in ourselves.* We must start to see ourselves for what we are in order to see others clearly and lucidly. We must begin to shed the shrouds of fear and mistrust that pervades our society. We are each capable of so much good yet somehow it lies stagnant and we are the losers. We have fought in four major wars in this country and have yet to learn that they accomplish nothing. We fight wars in the name of peace yet only generate more war. We must begin to trust ourselves as a people *who want peace through faith and understanding, not bullets and bombs. We must re-examine our traditions and morals with the* purpose of extracting the positive and discarding the negative so that we may advance our quest for peace. I feel that I can *no longer participate in an organization who's objectives include the killing of human beings.* ·

(2) There have been many sources contributing to the formation of my beliefs. I was baptized and confirmed in the Roman Catholic church. My formal religious education included first grade in a Catholic school and religious instructions during the school year while I attended public schools, up to my senior year in high school. During high school, I was a member and officer of Hi-Y, an organization for high school boys and girls that is affiliated with the Y.M.C.A. *As an officer, I organized discussions and seminars with local clergymen designed to broaden and improve my groups viewpoints on life and our understanding of man's relationship to man.* I also at-

tended leadership conferences oriented to demonstrate positive leadership characteristics from a practical as well as spiritual point of view. After graduating from high school, I attended the University of Nebraska. During my three and one-half years at Nebraska I majored in the social sciences, particularly history and political science. My course of study included courses in sociology, philosophy and psychology, with a minor in English. I was working toward a teaching certificate in secondary education because I felt that besides the primary goal of teaching people, I wanted to work with and help people. I felt that teaching would allow for both. As a social studies major, I studied war and it's effects on man. However, because of academically oriented environment, I was primarily concerned with the factual representations of history and war rather than the moral and religious implications. I was drafted on May 12, 1969, and since that time, have spent close to one year as a trainee. During each of the phases of my training, I was fortunate to have many close friends and I feel that I benefitted from each of them. Through these relationships, *I felt that I was different from my friends and the others in training with me. I felt different because I could not yell "Kill, Kill, Kill" with the rest of my basic training company* during bayonet training. *I could not thrust by bayonet into the dummy's throat even though it was just a dummy.* The Army gave me my first chance to shoot a gun. I felt different when I had to shoot a gun. I felt different when I had to shoot at the human-shaped targets. I knew that someday the targets could be real. I wasn't sure I could face that possibility in spite of all my training and even with my country's sanction. I was not aware of my friends feeling the same differences that I felt. This confused me and may have accentuated the doubts I was beginning to feel about killing and war. At this time, I was about one-half way through Infantry AIT. I began to feel that I needed time to think and I hoped that clarity and understanding would come with time. I volunteered for Infantry NCO School for two basic reasons. The first was that it gave more time to become aware of the cause of my uncertainties and secondly, if I decided that I could face combat that I would be better prepared because of the extra training. During a Character Guidance class in the initial period of my NCO training, I broke down and cried. The topic was the morality of war and killing. Suddenly, it became clearer to me that something was not allowing me to discuss a subject that I might have to face. I began to probe myself for answers to questions like: Could I kill a Man? Were all of the things that I had been taught and come to believe wrong? Could my country send a man to war against his conscience? I didn't have the answers to these questions, but I did know that I couldn't face combat, whether it was in Viet Nam or Korea or any place, until I did have the answers. I knew that I could not be an effective leader in combat and be responsible for other's lives with my doubts and uncertainties. Adding to my confusions was the fact that I felt that I had an obligation to this country. I knew that I couldn't continue in my training until I had answers to my questions, yet I knew that if I quit NCO school that I would very likely receive orders to Viet Nam without knowing if I could kill a man. My only legal alternative was reenlistment. As paradoxical and contradictory as it my seem I felt that by reenlisting I would have the time to find the answers to my questions and fulfill my military obligation while avoiding a situation that I simply couldn't face. In the little over one year since I reenlisted I have had the time to develop and define my beliefs; to see them crystallize into a strong, sincere objection to participation in war, not just the Viet Nam war even though that was the war that I was faced with, but to war regardless of form. I have read many books with detailed statements of conscientious objectors and pacifists hoping to see more of myself. These books include *We Won't Go: Personal Accounts of War Objectors,* edited by Alice Lynd and *Conscience in America,* edited by Lillian Schlissel. I have talked with many veterans about their participation in war again hoping to gain more of an insight into my own beliefs. In addition I have discussed by beliefs with three Army Chaplains, a civilian priest whose name is Father Philip Babiano, and with my family and friends. Just as our federal courts have taken the time to study the many concepts of conscientious objection, so have I taken the time to study myself in terms of being a conscientious objector. *It has taken almost two years in the Army for me to realize that I cannot participate in war. By taking a human life, I feel I would be stealing the most beloved possession that God has given to man.*

(3) There have been many individuals upon whom I have relied for religious guidance but there is not one person upon whom I rely most.

noted it in its entirety emphasizing the more pertinent portions to avoid needless repetition excepting those passages set forth, supra.

With due respect I fail to find in such statement a basis in fact for denying the petitioner's claim. To me it is manifestly an assertion of a deeply held moral and ethical conviction of the magnitude set forth in *Seeger* and *Welsh*, supra. Certainly Chaplain Olsen was of the same mind in stating that, "SP4 O'Hara is not applying for this separation on the basis of religious beliefs, although they are evident, but primarily from a personal moral and ethical decision." In the petitioner's supporting letters made part of this record we find the same sentiments expressed by others. It must also be noted that excepting Colonel Champion all Army officers who personally interrogated the petitioner found him sincere in his stated beliefs.

The fact that he recites the futility of war to obtain peace, and a belief against the taking of another man's life does not detract from the sincerity of his ethical and moral conviction that life is God-given, to be used in search of peace through faith and understanding, and that he can no longer further compromise his conscience and participate in an organization that demands the killing of a human being. He urges we search our souls to find truth in ourselves.

A less sincere but cutely expressive lexicographer might have fashioned words at his command in a more expressive manner. However, to most of us this is an illusive art. Few indeed can fully articulate the intensity of that spirituality which controls and directs their lives.

I find the petitioner clearly meets the requirements of *Welsh*, supra.

(4) It would be impossible for me to say that I do not believe in the use of force. Almost everyone has used force of one type or another, but I believe that it is up to the individual to decide the type and degree of force that one is capable of using. I believe there is a marked distinction between "force" and "violence". For example, the act of pushing a stalled car is not violent although the use of force is necessary. But, the explosion of an artillery or mortar round, while certainly an act requiring force, is a better example of an extremely violent act that is designed to destroy and kill. By preparing this application for discharge, I have rejected participation in war in any form. This also means that I have rejected the military's violent acts in war. But this does not mean that I would refrain from using force at every level. I believe that I would use the absolute minimum amount of force necessary, as a last alternative, to protect my family if their lives were endangered. Albert Einstein once said, "Peace cannot be kept by force." There is no understanding when a thousand pound bomb explodes or when napalm burns its victims; there is only the insanity of war and the senseless deaths of human beings. War is man's most extreme and aberrant expression of violence and the Army is the agent that produces this expression and I can no longer be a part of it.

(5) There are certain actions and behavior patterns that I feel indicate the type of person I am and have been throughout my life. I have never been a violent person. I have never been in a fight and have tried to avoid people who did fight. I have never been hunting in spite of the fact that a great many of my friends were and are avid hunters. I believe that I have been an honest, sincere person throughout my life; a person who trusts in God. I believe that my application for discharge as a conscientious objector is an example of a truthful, sincere effort to deal with and resolve the conflict between my conscience and my military duties. I believe that regardless of the outcome of this request for discharge, I will continue to act in accordance with my beliefs. This may include the refusal of an order that I feel will violate my conscience and the possible punitive measures that may be taken against me.

(6) While I have not given "public expression" of my views and beliefs, I have shared them with my friends and relatives through conversations and correspondence. I believe that through the interchange of thoughts and ideals on a more personal and intimate level, I have benefitted far more than if I had made public expression of my beliefs.

It is disturbing that the Board further premised its disapproval on the fact that " . . . although applicant was drafted in the Army in May 1969 he did not submit this application for discharge as a conscientious objector until 21 April 1971 a delay which is insufficiently explained" and points to his continued military service.

■ They disregard that the maturation of a conscientious objection is a developing process and not an ordained reflex action to be executed at will.

■■ The record here is clear. The petitioner continued to the point of crystallization, at which time he acted. His conduct in volunteering for NCO School does not gainsay his present position. In the developing process the soldier is in a transitional state without refuge. He has no alternative but to continue the way of life decreed for him until the agonizing search for answers has ended. Until the uncertainties are resolved he has every right, indeed the obligation, to better prepare himself for combat. Nor does his reenlistment obfuscate his conscientious objection. Vietnam was the ultimate and when confronted with this realization, still not knowing, he sought an alternative for more time. This clearly shows that the petitioner's objections resulted from a slow and thoughtful process. The insincere man would not have waited but rather would have sought immediate release. See *United States ex rel. Tobias v. Laird*, 413 F.2d 936, 939–940 (4th Cir. 1969).

Uncertainty at any point of time is not a basis for denying an application. " . . . so long as they (feeling of conscientious objection) developed during his period of service . . . the exact time at which they fully developed do not prove a lack of sincerity or deep conviction." *Rastin v. Laird*, 445 F.2d 645 (9th Cir. 1971).

As it was held in *Bates v. Commander, First Coast Guard District*, 413 F.2d 475 (1st Cir. 1969) a petitioner's present beliefs though inconsistent with past action are nevertheless credible for otherwise it would place him in a "hanged if he does, hanged if he doesn't position."

*Conclusion*

In the factual context of this case, which presents the unanimous recommendations of approval by the chaplain, psychiatrist, hearing officer, and unit commander, all as required under Sections 4(b) (2), (3), and (4) of AR 635–20 I must find it was a "verbalism without any real meaning" (*Helwick*, infra) for the Board to find the SP4 O'Hara lacked the required "depth" of conviction or that he was insincere. See *Clay v. United States*, 403 U.S. 698, 703, 91 S.Ct. 2068, 29 L.Ed.2d 810 (1971).

As the government concedes, petitioner has established a *prima facie* claim. He has shown, and the government has not disputed, that his opposition is based on "religious training and belief" as those words are interpreted in *Welsh*, supra, and that he is conscientiously opposed to war in any form. See *Armstrong v. Laird*, 456 F.2d 521 (1st Cir. Feb. 1, 1972).

■■ No basis in fact exists for the Secretary's denial of the petitioner's application for discharge; no basis in fact exists for a finding of insincerity. While the determination of an applicant's sincerity is necessarily subjective to some degree, the delicacy such a determination demands is not to be destroyed by allowing uncontrolled discretion in and automatic deference to the findings of the Board. As was eloquently said in *Helwick v. Laird*, 438 F.2d 959 (5th Cir. 1971):

"Therefore, in this case—indeed, as in all conscientious objector cases—the threshold question for review is the sincerity of the claimant in objecting, on religious grounds, to participation in war in any form. Sincerity is of course a subjective question. (citations omitted) Nevertheless, despite the narrow scope of review afforded the federal courts on the issue of sincerity, the Conscientious Objector Review Board is not vested

with unbridled and unfettered discretion in evaluating the evidence submitted in support of conscientious objector claims. (citation omitted) For example, the Board is not at liberty merely to disbelieve the claimant. There must be some facts in his application—hard, provable, reliable facts—that provide a basis for disbelieving the claimant." 438 F.2d at 963 I find no such facts to support the Board's determination.

 In addition to my holding that the denial of petitioner's conscientious objector's application for insincerity was not based in fact, I find further error in the Army's action. The Board made its decision on the basis of an improper standard. It stated "applicant lacks the depth of conviction required to qualify for discharge as a conscientious objector." This standard "depth of conviction" cannot be found in any of the statutes, regulations or decisional law. Again, I refer to Helwick v. Laird, supra, at 964,

> "We are astonished that 'depth and maturity' are prerequisites to conscientious objection to war. One does not have to be a St. Augustine or a Thomas Aquinas to qualify as a conscientious objector under AR 635–20. Caverly v. United States, 8 Cir. 1970, 429 F.2d 92, 94; United States v. Hesse, 8 Cir. 1969, 417 F.2d 141, 146. Cf. Talford v. Seaman, D.Md.1969, 366 F.Supp. 941, 945. We constantly classify as conscientious objectors many sincere persons singularly lacking in what military men or chaplains might describe as 'depth and maturity'."

Petitioner has repeatedly indicated that he cannot serve *in the military* because of his objection to war, see Opinion, Conscientious Objector Review Board, thus establishing that he is opposed to participation in both combatant and noncombatant service. Although the question of the proper remedy, see, e. g. Tobias v. Laird, supra, at 940, has not been argued, I find that outright release from the service is appropriate. See

Bohnert v. Faulkner, 438 F.2d 747 (6th Cir. 1971) ; Carney v. Laird, 326 F.Supp. 741, 749 (D.R.I.1971).

*Order*

It is hereby ordered that *Thomas C. O'Hara's* petition for writ of habeas corpus be granted and that, being illegally restrained of his liberty, he be discharged from the custody and control of the Army and the custody and control of the respondents as a conscientious objector without reassignment to civilian alternate service.