**Michael L. GOLDSTEIN, Petitioner,**

v.

**Hon. J. William MIDDENDORF,
et al., Respondents.**

**Civ. A. No. 74–2352–T.**

United States District Court,
D. Massachusetts.

Aug. 15, 1975.

Richard P. Fox, Los Angeles, Cal., for plaintiff.

Edward F. Haber, Boston, Mass., for petitioner.

James N. Gabriel, U. S. Atty., Marshall D. Stein, Asst. U. S. Atty., Boston, Mass., for defendant-respondent.

**54**

### OPINION

TAURO, District Judge.

This action involves a petition for Habeas Corpus by a reserve officer seeking release from the United States Navy as a Conscientious Objector. 50 U.S.C. App. § 456(j).

On March 4, 1971, Michael L. Goldstein accepted a Commission as a Lieutenant in the United States Naval Reserve, thereby incurring a six year reserve and a two year active duty obligation. The program in which he enrolled, popularly known as the "Berry Plan," allows a physician to defer compulsory military service in order to obtain specialized residency training while on inactive duty. *Lobis v. Secretary of U. S.* *Air Force,* 519 F.2d 304 (1st Cir. 1975); *Nurnberg v. Froehlke,* 489 F.2d 843 (2d Cir. 1973). The military provides no direct financial assistance to participants in the plan.

Dr. Goldstein was scheduled to complete his residency in neurology at Boston's Children's Medical Center in July 1974. On March 25, 1974, he received orders to report to active duty some time between July 1 and July 7 of that year. Earlier, however, on January 16, 1974, he had submitted an application for C. O. status, explaining that his first experiences as a young physician, as well as recent events overseas, had shaken him deeply and had convinced him that he could no longer complete the obligation which he had originally undertaken.[1] These events allegedly

---

1. "Since accepting my commission, I have again and again come up against defeat as a physician. I have seen young children die after long suffering, and then have made the same dismal diagnosis on a fresh, beautifully healthy appearing child, only to realize more clearly what lay ahead. I have come face to face with elderly people made useless with progressive deterioration, as a result of the wearing out of various parts of their bodies. I have seen the head of a family whose cells' ability to reproduce themselves and thus maintain their life become disturbed by malignant transformation, so that the wild and uncontrolled reproduction of these cells have destroyed the entire person. But I have also seen somewhat similar beginnings of illnesses reversed through intervention by medical science. These experiences have strengthened my conviction that I must devote what energy I possess to increasing the successes, even though temporary, and fighting human destruction and suffering where possible.

"The tragedy of the recent Middle East conflict had a special significance to me. Much of my mother's family was killed in Europe. If Israel had existed at that time they may have been able to escape destruction. I visited Israel in 1969 and was deeply moved by the energy, joy of living and devotion shared by the people. The wife of a fellow resident is Israeli and they are seriously considering living in Israel. When I visited Israel in 1969 I saw the great pride in the military accomplishments. It seemed that surely the well-being of the nation was dependent on their ability to make war with consequent effects on their enemies. I have

been greatly troubled this past year over the increasing threates to the safety of Israel and her people.

"Despite her military victories and strength, eleven of her finest athletes were murdered while participating in the Olympic Games. Her foreign emissaries were kidnapped and murdered. Her adversaries were amassing greater and greater military strength. Finally, in October [1973], another war, which, in many respects the Israelis won on the battlefield, left every person on both sides with great personal tragedy. I therefore changed my attitude toward their military superiority. Looking back on the entire experience, I must now conclude that their energies and lives would have been more profitably spent finding non-military ways to secure their independence. Their great deterrent strength had only led to greater destruction when the war eventually came. If peace now comes to the Middle East, it will be due to the realization by both sides that military conflicts are too costly. The real tragedy may be that they did not realize this before any war, and non-destructive means were not more fully explored to settle international disputes.

"A physician in the armed forces, while he may not directly contribute to war, does contribute to the strength of the armed service. In the past months I have come to realize that in the long run this strength will increase the destruction in war. I cannot any longer in good conscience give direct personal support to the armed forces such as continuance in the United States Naval Reserve. I now believe my further participation in the Navy would be a direct personal support of

crystallized the religious and cultural training of Goldstein's early years.[2] The application was accompanied by letters from six persons who had known Goldstein at various points throughout his life and who attested to the sincerity of his convictions and the depth of his beliefs.[3]

The Navy followed its usual procedure in reviewing Goldstein's request. 32 C. F.R. Part 888e. *See Wallace v. Schlesinger,* 500 F.2d 117, 118 (9th Cir. 1974). He was first examined by a Navy psychiatrist who reported that Goldstein did not suffer any mental disorder and that his beliefs were "poorly delineated" but "sincerely held at this time." He was then interviewed at some length by Catholic Chaplin Hannigan who reported that he found Goldstein sincere. Finally, Goldstein was interviewed by Lieutenant Commander Peter A. Hewett of the Judge Advocate General's Corps. Hewett, however, concluded that the beliefs which petitioner expressed in his application were not "sincerely held" and that Goldstein was therefore not entitled to C. O. status.[4]

Goldstein's records were then forwarded to the Chief of Naval Personnel who adopted Hewett's recommendation. As a result, Goldstein's original orders to report for active duty remained undisturbed.

Goldstein then brought this action for a writ of habeas corpus. On July 3, 1974, after a hearing at which all parties were represented, this court ordered the respondents to postpone or cancel Goldstein's orders to report to active duty and enjoined the respondents from taking any action which might remove Goldstein from the court's jurisdiction pending the outcome of the lawsuit.

I

■ The scope of judicial review over the denial of C. O. status is exceedingly narrow. Whether the issue arises as part of a defense to a selective service prosecution, or as the basis for a habeas corpus petition by a serviceman who has already been inducted, the standard is the same. So long as there is some basis in fact for the denial of the application, the decision to refuse exemption must be affirmed. *United States v. Stewart,* 472 F.2d 1114 (1st Cir. 1974); *Helwick v. Laird,* 438 F.2d 959 (5th Cir. 1971); *Bates v. Commander, First*

---

the armed forces. I can no longer in good conscience give such direct personal support. I am a loyal American. I love the United States of America and the principles upon which it stands. I believe that as an individual I should be allowed to perform my obligated service to the country in a way alternative to the armed forces."

2. "I am 28 years old. I was born in Chicago into a family with deep religious conviction. My mother's family practices Orthodox Jewish belief, my father's Conservative. I received religious education and a Bar Mitzvah in the Orthodox tradition. My studies included translations of parts of the Old Testament from Hebrew into English. My grandfather and maternal uncle exercised the daily wrapping of symbolic prayer phylacteries on their arms and head. These were passed down to me as I approached the time of my Bar Mitzvah. I was taught to respect all living creatures. No firearms were allowed in our home. My mother insisted on alternatives to guns as toys. I was disappointed when I was not allowed to

shoot target practice with a friend, and I have never forgotten my mother's deep conviction that 'guns are for killing' and that was not for us."

3. Additional letters were subsequently submitted by Goldstein.

4. "It is incumbent upon the investigating officer to conduct an extensive and critical examination of the applicant's conscientious objector beliefs in order to objectively evaluate whether those espoused beliefs are sincere and deeply held. Because the very nature of the beliefs (namely, an espousal of personal beliefs based upon an applicant's subjective state of mind) does not lend itself to readily discernible direct evidence to rebut the *prima facie* case apparently made out by an applicant who complies with the specific and detailed provisions of BUPERS Manual Article 1860120, it is often necessary for the investigating officer to rely on circumstantial evidence to support his findings of sincerity or insincerity and his recommendation for approval or disapproval."

*Coast Guard District Station,* 413 F.2d 475 (1st Cir. 1969).

■ In order to qualify for C. O. status, an applicant must demonstrate (1) that he is conscientiously opposed to war in any form (2) that his opposition is based upon religious training and belief and (3) that his objection to war is sincere. *Clay a/k/a Ali v. United States,* 403 U.S. 698, 700, 91 S.Ct. 2068, 29 L.Ed. 2d 810 (1971); *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970); *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965). *Accord, Rosenfeld v. Rumble,* 515 F.2d 498 (1st Cir. 1975). The only issue in this case is whether there is some factual basis in the record to support the Navy's finding that Goldstein's objection to war was not sincere.

## II

■ Sincerity is the crucial element on which any request for C. O. status ultimately rests. *Witmer v. United States,* 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955); *United States v. Willson,* 452 F.2d 529, 532 (9th Cir. 1971). *See also United States v. Abbot,* 425 F.2d 910 (8th Cir. 1970); *O'Hara v. Laird,* 339 F.Supp. 101 (D.R.I.1972); *United States ex rel. Martinez v. Laird,* 327 F.Supp. 711 (N.D.Fla.1971). "[O]bjective facts [become] relevant only insofar as they help in determining the sincerity of the registrant in his claimed belief . . . ." *Witmer v. United States, supra,* 348 U.S. at 381, 75 S.Ct. at 396 (1955). Were the law otherwise, mere recitation of the appropriate words and phrases would suffice to exempt a person from military service. *United States v. Corliss,* 280 F.2d 808,

814 (2d Cir.), *cert. denied,* 346 U.S. 884, 81 S.Ct. 167, 5 L.Ed.2d 105 (1960). *See also United States ex rel. Hemes v. McNulty,* 432 F.2d 1182, 1186 (7th Cir. 1970). Accordingly, a finding of insincerity, so long as there is a basis in the record to support it, provides sufficient grounds to deny a C. O. claim. *United States v. Downer,* 139 F.2d 761 (2d Cir. 1944).

■ On this record, it appears that there was a basis for denial of Goldstein's application on grounds of insincerity. In his report to his superiors, Commander Hewett cited a series of factors which led him to conclude that Goldstein's application was insincere. At least one, Goldstein's demeanor during his interview, provides a satisfactory basis in fact to support his conclusion.[5]

Commander Hewett points to a number of passages in the hearing transcript which reveal "Goldstein's propensity to respond in a rambling, disjointed, vague and generally disorganized manner." Paragraph 6a. For example, at one point Goldstein is asked if he subscribed to the oath he took upon being Commissioned. He replied:

A. Well, it would be the—the—since I—I think I would—I've thought about the kinds of obligations since I took the oath. I think—as I said, when I took the oath, I felt a—I felt a strong obligation and I—I think my feelings were fairly similar to other people's in terms of feeling about—having the same feeling about the service, that it was—the advantages —you know—the good things and bad things about the service. Since—since I took the oath, I have had, you know—I have had several—you know,

---

5. In his recommendation to the Chief of Naval Personnel, Commander Hewett listed several other factors which he felt further reflected Goldstein's insincerity. These included Goldstein's consultations with the American Civil Liberties Union and the Harvard Committee on Legal Research prior to making his claim, his stand on abortion and the treatment of terminal patients, and the timing of the application as corresponding with the October 1973 War in the Middle East. The government eschews reliance upon these factors. Memorandum in Opposition to Issuance of Writ of Habeas Corpus at 5.

I have spent the time in my training. I did my internship and then three years of residency. I've thought a lot about my relationship to other people and what I should do as a physician and how I should lead my life, et cetera, and then I have also had other opportunities to think about—about war . . . .

Pointing to this passage the hearing officer wrote of Dr. Goldstein's nervousness:

The investigating officer fully appreciates the potential for nervousness during the early parts of such a proceeding and was prepared to take this into consideration in evaluating the manner of his responses. However, in view of the fact that the applicant's responses were consistently so impaired, it is my finding that the manner of his responses raises substantial doubt on the issue of his sincerity and the depth of conviction of his purported conscientious objector beliefs. This mannerism consistently manifested by the applicant is immediately verifiable by a reading of the verbatim transcript (enclosure (14) (pp. 10, 65).

Much later during the hearing, at page 65, Dr. Goldstein was asked if he would bear arms if the United States were invaded:

A. Well, as you pointed out, even with the military, the country has been invaded. I don't—I would not necessarily believe that just because we were invaded. I don't—I would not necessarily believe that just because we were invaded, it would be due to the fact that we didn't have a military. I mean the military hasn't prevented it from being invaded in the past. Why should you blame the —stopping the military on—on—on a future invasion? I'm sure—well, I can't be sure because, you know, I really don't have all the information but, from what I believe of what's going on in the world situation at the present time, a. disbandment of the

military would not—we wouldn't be—who would attack us tomorrow or next week?  . . .  I mean, you know —and I think that—again, you get—I would, if I had—if I had my druthers and I could control all of this, spending all of this energy—I don't know how much is required—I don't know how much you can accomplish with eighty billion dollars and three million men.

In addition to being nervous, Goldstein was also evasive. Again when asked if he would bear arms, he replied, "It would greatly disturb my conscience. I would not like to do that." When further pressed for a more specific answer, he responded:

Q. Could you or would you?

A. Well, I certainly wouldn't pick up a gun and start shooting people. That I know I wouldn't do.

As Hewett noted:

b. I find that the applicant's responses can be further characterized as evasive and so cautious as to lead me to conclude that he was reacting unduly defensively. Such an unreasonable defensive posture taken by the applicant gives me reason to conclude that he was responding in a less than forthright and sincere manner. (pp. 10, 13, 14). My finding that he was being evasive is further supported by the fact that the applicant on several occasions throughout the hearing would preface or conclude an answer with seemingly apologetic acknowledgments that he was "hedging" or "not answering the question." (pp. 13, 41, 52). His defensiveness was further manifested by his tendency to resist the thrust of hypothetical situations created by me. (pp. 54, 63, 65). Instead of answering these questions honestly and forthrightly, he demonstrated a cautious concern to make sure that the answer he gave was consistent with his claimed beliefs and did not contradict any previous statement contained in his written application. On occasion, he would avoid the

thrust of the question by retreating to the security of his previously prepared application and embark on a lengthy and repetitious digression of segments of his written application, the contents of which were not called for by the question and, in the investigating officer's view, were not germane. (pp. 15, 16) His behavior I would characterize as unresponsive and equivocal. He engaged in semantic duels with the investigating officer on questions which were sufficiently specific to warrant a direct answer. (pp. 10, 38).

█ It may well be that vague and disjointed responses, and nervousness throughout a hearing, could be evidence of either sincerity or insincerity. For some, nervousness might indicate an uncomfortableness because their facade was being penetrated. For others, it would indicate just the opposite—a struggle to come to terms with the conflict between their conscience and societal pressure to conform and support the military. Yet where two inferences may be drawn from the same testimony, and where the applicant's demeanor at the hearing so sharply contrasts with what might be expected of a well-educated and otherwise articulate individual, the court must accept the conclusions of the hearing officer. As the Court of Appeals has noted, it is he alone who has had the "opportunity of questioning the applicant, observing the strengths and weaknesses in his responses, scrutinizing his demeanor and attitude, and receiving a first hand impression of his persuasiveness in defending the earnestness of his convictions." *Lobis v. Secretary of the Air Force*, 519 F.2d 304 (1st Cir. 1975). The court is left only with the responsibility of determining whether the reviewing officers were rational and sincere in their decision "and this on a record always cold and often thin." *United States v. Corliss*, 280 F.2d at 814–15. On this record, the court must say that the reviewing officers met such a standard.

. Moreover, the Navy's conclusion is buttressed when Goldstein's demeanor at the hearing is compared with the picture painted of him by those who submitted letters in support of his application.

Robert Linn, who knew the applicant for "over 15 years" described him as follows:

Mike, my son and I have often had lengthy, soul-searching discussions on the futility of war solving any problem and the immorality of harming and/or killing a fellow human being

. . .

I respect Mike for the decision he made and assure the reader that this decision was not made lightly. *Mike does not make snap judgments or quick decisions. He is cerebral rather than emotional.* This is why he has taken so long to come to the conclusion that he cannot participate in the armed services without doing violence to his very being—his conscience. (emphasis supplied).

This appraisal was joined in by Dr. Kohlenbrenner, who had been applicant's pediatrician and knew him "since he was a child:"

I have always admired his intellectual honesty and emotional stability and I know that his actions are based on well analyzed consideration of a problem.

Thus, although Goldstein was known by his friends as "cerebral rather than emotional" and as a person who carefully thought out his views before acting, his manner during his interview belied that assessment. He was nervous and ill-at-ease throughout and, in the words of the Navy psychiatrist, his opposition to war appeared not to have been "clearly delineated." His demeanor at the hearing then was out of character, a factor which can only support the Navy's conclusion that there was special cause for Goldstein's anxiety rather than it being a normal feature of his personality.

As has so often been noted in this troublesome area of the law, a reviewing court cannot sit as a super draft board or as a forum for de novo review of an in-service classification. It may well be that had the court made the initial decision on Goldstein's application, it would have granted him C. O. status. But the role of the judiciary in this area is narrowly circumscribed and the scope of review exceedingly limited. Under these circumstances, and viewed in light of the record in this case, the court must find that there existed sufficient basis in fact for the denial of Goldstein's application. The petition for a writ of habeas corpus must therefore be denied.